**E-FILED on** 6/24/09

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STANLEY G. ALLGROVE,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE[1],<br>Commissioner of Social Security<br><br>Defendant. | No. C-06-00018 RMW<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>**[Re Docket Nos. 13, 14]** |

Plaintiff Stanley G. Allgrove ("Plaintiff") seeks reversal of a decision by Defendant Commissioner of Social Security ("Defendant") denying him disability insurance benefits.[2] Plaintiff and Defendant filed cross-motions for summary judgment. Plaintiff alleges that the findings of the ALJ regarding Plaintiff's ability to perform light work are not supported by substantial evidence and were reached by improper application of law.

---

[1] Michael J. Astrue became Commissioner of the Social Security Administration on February 1, 2007. Pursuant to Ruled 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is hereby substituted for Jo Anne B. Barnhart as the Defendant in this matter.

[2] The challenged decision was rendered by Administrative Law Judge on July 26, 2005. The ALJ's decision became final on November 17, 2005 when the Appeals Council of the Social Security Administration denied Plaintiff's request for administrative review of the ALJ's decision.

1  Pursuant to this Court's procedures for review of social security actions, the parties' motions
2 have been submitted without oral argument. Based on the moving papers and the Court's own
3 analysis of the record, the Court grants Defendant's cross-motion for summary judgment and denies
4 Plaintiff's motion for summary judgment or remand.

## I. BACKGROUND

### A.  Claimant's Vocational and Medical History

Plaintiff was born on April 9, 1952 and, therefore, was 50 years old as of the alleged onset date of disability on October 1, 2002. Administrative Transcript ("Tr.") 89. He obtained his General Equivalency Diploma (G.E.D.) and has no further formal education. Tr. 89, 52. Plaintiff worked as a residential handyman doing electrical and plumbing repairs, carpentry and painting from January 1988 until October 2002 (Tr. 52), when he allegedly became disabled as a result of severe back and leg pain. Tr. 52, 170.

On October 16, 2002, Plaintiff underwent an MRI of his lumbar spine after seeking emergency room treatment for back pain. Tr. 15. The MRI revealed a "leftward L3-4 foraminal disc herniation." Tr. 100, 110-111. On January 16, 2003, Glenn E. Harper, M.D. performed a left L3-4 microdiscectomy surgery without complications. Tr. 100-101. The indications for the surgery were the MRI results and the Plaintiff's back and lower extremity pain. His neurologic examination was "fairly unremarkable." Immediately following the surgery, Plaintiff testified that he "seemed okay but some pain returned." Tr. 171.

On June 17, 2003, Dr. Harper noted after a follow-up appointment that Plaintiff had experienced a reoccurrence of pain down his lower left extremity approximately two months following the surgery, and had "recurrent left lower sciatic pain." Tr. 115. Plaintiff reported that he had been too "aggressive with his activities" including "a great deal of heavy lifting" in working on building a house and "riding a giant inner tube down an embankment of snow." *Id.* Dr. Harper noted that Plaintiff had good strength in the bilateral lower extremities in all muscle groups and normal sensation. He recommended a conservative course of treatment and his impression was "recurrent left lower extremity sciatic pain."*Id.*

On May 16, 2004, Hideki Garren, M.D., acting on behalf of the Social Security Administration, performed a consultative medical examination on Plaintiff. Tr. 15, 122-124. Dr. Garren noted that Plaintiff reported a history of chronic lower back pain with left sided sciatica for over 10-12 years. Tr. 123. Dr. Garren noted that the "[n]eurologic examination was normal and nonfocal today" although noting decreased intact sensation along the left anterior aspect of the tibia, limited range of motion of the spine due to pain, and an inability to perform heel to toe walking. Tr. 123-24. Dr. Garren's impression was chronic low back pain with left sided sciatica. Tr. 123. She believed Plaintiff had the ability to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk six hours in a day, sit six hours out of an eight-hour workday with frequent short breaks to change position, and occasionally stoop, crouch, and bend his back. Tr. 124.

On June 7, 2004, a DDS physician completed a Physical Residual Functional Capacity ("RFC") Assessment, finding Plaintiff capable of occasional lifting and/or carrying 50 pounds, occasional stopping and crouching, frequent lifting and/or carrying 25 pounds, and standing and sitting for a total of six hours in an eight-hour workday. Tr. 138-39.

Plaintiff testified that he began having pain in his neck around late 2004. Tr. 173. He described very sharp pains in the direct center of his neck and the top of his back. *Id.*

On December 9, 2004, Plaintiff underwent x-rays of his cervical spine to address his complaints of neck pain. Tr. 147. The radiologists's impression was degenerative disc disease, principally at C6-7 with rather notable encroachment by osteophyte on the neutral foramina, right and left, at this level. *Id.*

On January 7, 2005, Dr. James Kohut, M.D. performed a neurosurgical consultation, in which Plaintiff complained that his pain remained unremitting. Tr. 157. After a neurological examination, Dr. Kohut opined: "[Plaintiff] suffers from probable cervical radiculopathy, of uncertain origin. The neck and shoulder symptoms can be from a C5 radiculopathy . . . I would recommend an MRI of the C spine to define this better." *Id.*

On May 9, 2005, Plaintiff had a cervical spine MRI scan that indicated "[m]ild to moderate multilevel degenerative disc and facet disease and multilevel foraminal stenosis, most pronounced at C-6-7 on the left" and "abnormal marrow signal at C6-7 likely degenerative in nature." Tr. 163.

1      Plaintiff also had an MRI of his lumbar spine because of his history of left lumbar radiculitis.
2  The radiologist's impression was:
3      "1.  Relatively stable multilevel degenerative disc disease and mild to moderate multilevel
4  foraminal stenosis, again most pronounced at L3-4 on the left.
5      2.  Stable shallow right lateral disc protrusion at L4-5.
6      3.  Possible mild post surgical epidural fibrosis at L3-4.  Clinical correlation is needed."
7  Tr. 162.  Plaintiff testified that prior to his neck injury he could not have returned to work because
8  he suffered another herniated disc (the medical records show that Plaintiff did not suffer another
9  herniated disc) and subsequent worsening pain.  Tr. 174.  Plaintiff further testified that he did not
10 think he could perform any job requiring him to stand on his feet for most of the day because "[i]t
11 just hurts too much to be standing," specifically his back, shoulders and neck.  Tr. 176.  He further
12 said he did not think he could do a job where he could change when he felt like it from sitting to
13 standing.  Tr. 176.  He testified that he continues to suffer from severe pain, including sharp, hot
14 pains in the center of his neck and top of his back (Tr. 173) and that sometimes the pain is even more
15 severe than prior to the surgery.  Tr. 171.  Any sort of quick movement, standing on his feet, sitting
16 too long, or lifting anything that is too heavy exacerbates the pain.  *Id.*  To relieve the pain in his
17 back from sitting, he gets up and walks around or lays down and tries to get his mind off his pain.
18 Tr. 172.  Sitting for ten minutes produces anxiety, sometimes aching pain.  *Id.*
19 Plaintiff has been treated by Stephen J. Halpern, M.D., who prescribed Hydrocodone, Methadone,
20 and Gabapentin to Plaintiff.  Tr. 172.  Plaintiff testified that Hydrocodone makes him sleepy.  Tr.
21 173.

22      **B.      Procedural Background**
23 In a decision issued on July 26, 2005, the ALJ determined that Plaintiff was not disabled through a
24 five-step analysis.  Tr. 15-19.  Plaintiff filed a request for review with the Appeals Council, and on
25 November 17, 2005, the Appeals Council denied his appeal, making the decision of the ALJ the
26 final decision of the Commissioner.  Tr. 4-6.  This civil action followed.
27
28

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT OR REMAND—C-06-00018 RMW
JSS                                                                 4

## II.  LEGAL STANDARD

### A.     Standard for Reviewing the Commissioner's Decision

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review the Commissioner's decision denying Plaintiff benefits.  Under section 405(g), a district court reviewing the Commissioner's decision on an application for benefits may affirm, reverse, or remand.  *See Harman v. Apfel*, 211 F.3d 1172, 1174 (9th Cir. 2000) (citing *Ramirez v. Shalala*, 8 F.3d 1449, 1451 (9th Cir. 1993)).  However, the district court's scope of review is limited.  The Commissioner's decision (here the decision of the ALJ) will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  42 U.S.C. §405(g); *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  Evidence is substantial if it is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Sandgathe v. Charter*, 108 F.3d 978, 980 (9th Cir. 1997).  To determine whether substantial evidence supports the Commissioner's findings, this court must review the administrative record as a whole, weighing evidence that both bolsters and detracts from the Commissioner's conclusion.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  Where the evidence is susceptible to more than one rational interpretation, this court must adopt the decision of the ALJ.  *Sandgathe*, 108 F.3d at 980.  "However, even though the findings be supported by substantial evidence, the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision."  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (internal quotations and citations omitted).

### B.     Standard for Determining Disability

A person is "disabled" for the purposes of receiving social security benefits if he or she is unable to engage in any substantial gainful activity due to a physical or mental impairment that is expected to result in death or that has lasted or is expected to last for a continuous period of at least twelve months.  *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992); *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  Social Security disability cases are evaluated using a five-step, sequential evaluation process.  20 C.F.R §404.1520(a)(4), §416.920(a)(4).  In the first step, the Commissioner must determine whether the claimant currently is engaged in substantial gainful

activity; if so, the claimant is not disabled and the claim is denied. *Id.* If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments which significantly limits the claimant's ability to do basic work activities; if not, a finding of "not disabled" is made and the claim is denied. *Id.* If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments; if so, disability is conclusively presumed and benefits are awarded. *Id.* If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing of Impairments, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity"[3] to perform his or her past work; if so, the claimant is not disabled and the claim is denied. *Id.* The claimant has the burden of proving that he or she is unable to perform past relevant work. *Drouin*, 966 F.2d at 1257. If the claimant meets this burden, a *prima facie* case of disability is established. The Commissioner then bears the burden of establishing that the claimant can perform other substantial gainful work;[4] the determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995), *as amended* April 9, 1996; *Drouin*, 966 F.2d at 11257.

### III. ANALYSIS

Plaintiff asserts that the ALJ committed three errors: (1) he assumed the role of a medical diagnostician and determined that because Plaintiff did not have a herniated disc he could perform "almost the full range of light work" rather than obtaining testimony from a medical expert; (2) he improperly rejected Plaintiff's testimony concerning the side effects of Plaintiff's medications; and (3) he improperly applied the Medical-Vocational Guidelines when he should have called for a

---

[3] A claimant's residual functional capacity is what he or she can still do despite existing exertional and nonexertional limitations. *Cooper v. Sullivan*, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[4] There are two ways for the Commissioner to meet the burden of showing that there is other work in significant numbers in the national economy that claimant can do: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines. *Tackett*, 180 F.3d at 1099.

vocational expert who could have considered whether he had any vocational opportunities given his chronic pain and the side effects of his medication.

### A. ALJ's Decision that Plaintiff Had the Capability to Do "Light Work"

Plaintiff contends that the ALJ erred by deciding, without invoking testimony from a medical expert, that given the absence of a herniated disc, Plaintiff remained capable of performing "almost the full range of light work." Specifically, Plaintiff asserts that the ALJ did not properly consider the MRI scans that Plaintiff submitted after the hearing. Defendant asserts that the ALJ properly interpreted the evidence.

At the conclusion of the hearing, Plaintiff testified about further x-rays of his neck and back that were not available for the ALJ's consideration at the time of the hearing. The ALJ commented as follows:

> I have read your brief very briefly last night when I got the file, and I don't know how I'm going to decide this case. I did not think about how I will decide this case under the grids. But let me tell you this, Mr. Sackett. If the X-ray shows he has a herniation he'll have no problems. If the X-ray does not show he has a herniation but an MRI would, you might want to consider paying for the MRI . . . So what I'm going to do is I'm going to leave the record open for 30 days and get me whatever you can get me, the X-ray for sure because that's been done already. ... But I'm only going to leave it open for 30 days, and I'll decide the case. It may turn out, I just would let you know, it may turn out that we don't need any of this stuff, that I would grant it anyway. I'm not inferring anything but it may not so that's what I'm going to do.

Tr. 177-78.

Plaintiff mischaracterizes the ALJ's statement when he says that the ALJ improperly acted as a medical diagnostician. The comment made by the ALJ does not suggest that the ALJ would make any medical diagnosis nor does it imply that Plaintiff had to have a herniated disc in order to be found disabled. The ALJ reviewed the MRIs submitted after the hearing and concluded that those reports, along with all the other evidence submitted, did not support a finding of disability. That conclusion is supported by substantial evidence.

The MRI reports of the cervical and lumbar regions that were performed on May 9, 2005 do not show a herniation in either region. Rather, the MRI scan of Plaintiff's cervical spine showed "[m]ild to moderate multilevel degenerative disc and facet disease and multilevel foraminal stenosis, most pronounced at C-6-7 on the left" and "abnormal marrow signal at C6-7 likely degenerative in

nature." The MRI of the lumbar spine degenerative disc disease with mild to moderate multi-level narrowing most pronounced at L3-4 and a stable shallow right lateral disc protrusion at L4-5. The report also noted possible mild post surgical epidural fibrosis at L3-4. Thus, the ALJ concluded that "[t]he abnormal findings noted in the May 2005 cervical spine and lumbar spine MRI scans are consistent with the limitations found herein." Tr. 17.

Dr. Garren, an examining physician and Board Certified Neurologist, opined that Plaintiff could perform light work. Tr. 122-24. The non-examining State agency physicians suggested that Plaintiff could actually do medium work, although the ALJ apparently rejected or perhaps did not even consider this opinion. Plaintiff has not identified any medical opinion that contradicts Dr. Garren's conclusions as to Plaintiff's functional limitations. Therefore, the ALJ's conclusion is supported by substantial evidence. Additionally, the MRI scans submitted by Plaintiff did not establish any disc herniation to support Plaintiff's allegations of subjective disabling pain. Rather, the MRI results showed mild to moderate changes and did not establish that Plaintiff was actually disabled. While the MRI reports confirmed that Plaintiff suffered from a back condition, it is undisputed that Plaintiff had back problems. In other words, the MRI reports reflect disease that is with the limitations Dr. Garren noted. The MRI of the cervical spine showed mild to moderate disease but no medical evidence was offered that suggested this condition would preclude light work. Accordingly, the ALJ's conclusion that Plaintiff could do light work was supported by substantial evidence and consistent with the medical information presented by Plaintiff.

### B.     Side Effects of Medications

Plaintiff argues that the ALJ's rejection of his testimony regarding the side effects of his medication was not supported by substantial evidence and did not meet the requisite Ninth Circuit standard found in *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 585-86 (9th Cir. 1988).[5] Defendant argues that the ALJ properly found Plaintiff's allegation of disabling side effects

---

[5] *Varney* provides:

> Like pain, the side effects of medications can have a significant impact on an individual's ability to work and should figure in the disability determination process. *Cf. Howard*, 782 F.2d at 1488. Also like pain, side effects can be a "highly idiosyncratic phenomenon" and a claimant's testimony as to their limiting effects

to lack credibility.

When weighing a claimant's credibility, the ALJ may consider at least the following factors: "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between his testimony and his conduct, [claimaint's] daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ's findings are entitled to deference if they are supported by substantial evidence in the record and are "sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding [subjective symptoms]." *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991).

An ALJ may also consider various factors in assessing the credibility of the allegedly disabling subjective symptoms, including "the nature, location, onset, duration, frequency, radiation and intensity" of any pain or other symptoms, "precipitating and aggravating factors," and "type, dosage, effectiveness, and adverse side-effects of any medication." *See* 20 C.F.R. §§ 404.1529, 416.929; *Bunnel,* 947 F.2d at 346-47. In *Thomas v. Barnhart,* 278 F.3d 947, 960 (9th Cir. 2002), the court upheld the ALJ's decision to discount the alleged side effects of the claimant's pain medication when the claimant's "own statements to her doctor and her testimony at the hearing" were "the only evidence regarding these symptoms." In *Thomas*, the ALJ provided "a specific, clear and convincing reason, supported by the record, that her testimony was generally not credible,"

---

should not be trivialized. *Cf. id.* Therefore, if the Secretary chooses to disregard a claimant's testimony as to the subjective limitations of side effects, he must support that decision with specific findings similar to those required for excess pain testimony, as long as the side effects are in fact associated with the claimant's medication(s). *Cf. Cotton*, 799 F.2d at 1407; *see also Figueroa v. Secretary of Health*, *Education and Welfare,* 585 F.2d 551, 554 (1st Cir.1978) (ALJ must make finding on appellant's claim regarding side effects of medication). Because no such findings were made here, we remand the matter so that, as in the case of the pain testimony, the ALJ may either accept Varney's evidence regarding side effects or make specific findings rejecting such evidence. Again, any specific findings rejecting her testimony must be supported by the record and will be subject to further review by the courts.

*Varney*, 846 F.2d at 585-86.

relying on the claimant's demeanor at the hearing and finding that "she seemed to engage in considerable histrionic exaggeration." *Thomas*, 278 F.3d at 960 (9th Cir. 2002); *see also Light,* 119 F.3d at 792 (upholding ALJ's finding that a claimant generally lacks credibility as a permissible basis for rejecting claimant's testimony).

Here, in response to Plaintiff's testimony that Hydrocodone made Plaintiff sleepy, the ALJ noted:

> The claimant testified that Hydrocodone "knocks me out." However, this complaint is not mentioned in the medical records. The record contains no reported continuous side effects of medication. When side effects are mentioned, the treatment notes reflect that the medication was adjusted or changed.

Tr. 17.

The ALJ made this determination as part of a credibility determination regarding Plaintiff's subjective complaints of his disabling symptoms. The ALJ found discrepancies between Plaintiff's assertions at the hearing and information contained in the reports of the treating and examining physicians. The ALJ found that "the allegations by [Plaintiff] as to the intensity, persistence, and limiting effects of his symptoms were not well supported by the probative evidence and [were] not wholly credible." The objective medical evidence and the level of treatment do not support level of severity claimed by Plaintiff and are more in line with the restrictions suggested by Dr. Garren. Tr. 17. Nothing in the medical evidence indicates that the side effects of Plaintiff's medication would prevent him from doing "light work." *See* Tr. 123-4, 138-39. Also, the ALJ found that Plaintiff's statements were unreliable, as he testified that he had not looked for work because "the pain returned shortly after the operation,"(Tr. 177), but the medical evidence indicates that plaintiff did "extremely well" after surgery for approximately two months. Tr. 115. He apparently engaged in heavy lifting while working on building a house and at least felt good enough to ride a giant inner tube down an embankment of snow. *Id.* The ALJ noted that the level of treatment rendered was inconsistent with Plaintiff's subjective complaints. Tr. 17. The ALJ did not arbitrarily discount Plaintiff's testimony regarding the side effects of the medication. The record adequately supports his conclusion.

**C.     Use of the "Grids"**

Plaintiff contends that the ALJ erred in relying on the Medical-Vocational Guidelines ("the

grids")[6] to determine that Plaintiff was "not disabled" rather than calling for a vocational expert. Defendant asserts that the ALJ correctly relied on the grids to determine whether there was work that Plaintiff could perform despite his impairments. If the grids accurately and completely describe a claimant's particular impairments, an ALJ may apply the grids instead of taking testimony from a vocational expert. *Holohan v. Massanari*, 246 F.3d 1195, 1208-09 (9th Cir. 2001). If they do not, then the ALJ must also hear testimony from a vocational expert. *Id.*

The grids are based only on strength factors. *Id.* Thus they are sufficient only when a claimant suffers only from exertional limitations. *Id.* They "describe only 'major functional and vocational patterns.'" *Varney*, 846 F.2d at 585 (9th Cir. 1988) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a)). The court in *Holohan* stated that "[b]y relying entirely on the grids to determine that there was work that [complainant] was capable of performing with his limitations, the ALJ committed clear legal error." *Holohan*, 246 F.3d at 1208-09. Pain and medication side effects have been recognized as nonexertional limitations. *See Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999) (examples of non-exertional limitations are pain, postural limitations, or environmental limitations).

However, the fact that a non-exertional limitation is alleged does not automatically preclude application of the grids. *Desrosiers*, 846 F.2d at 577. The ALJ should first determine if a claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations. *Id.* The ALJ must weigh conflicting evidence concerning the claimant's past work experience, education, and present psychological and physical impairments. *Id.* The ALJ then applies the grids to these factors, ensuring that the final determination will be both consistent with other similar cases and expeditious. *Id.* The ALJ may rely exclusively on the Guidelines if the

---

[6] For claimants found capable of sedentary, light or medium work, the regulations provide three grids, also known as the Medical-Vocational Guidelines, one corresponding to each level of residual functional capacity. The Grids account for the vocational factors of age, education and work experience, which are referred to in the statute. *See* 42 U.S.C.A. § 423(d)(2)(A) (1999). The ALJ determines a claimant's age, education and work experience and reads from the appropriate table and line the conclusion of whether the claimant is disabled. Once the components which make up the Grids are determined, the Grids themselves direct a conclusion of disabled or not disabled. *See Desrosiers v. Sec'y of Health & Human Services,* 846 F.2d 573, 576-77 (9th Cir. 1988); 20 C.F.R. § 404.1501 *et seq*; Part 404, Subpart P, Appendix 2.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR REMAND—C-06-00018 RMW
JSS                                                                 11

non-exertional impairments do not significantly affect claimant's residual functional capacity. *See, e.g., Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

Here, Plaintiff asserts that his "non-exertional postural limitations" and his "side-effects of prescribed medications" precluded the use of the grids. Motion at 14. However, as to Plaintiff's "non-exertional postural limitations," the ALJ determined that the medical evidence did not show that pain prevented Plaintiff from performing light work. Dr. Garren did recommend certain limitations on Plaintiff's activities. These limitations neither preclude light work which recognizes such limitations nor the use of the grids. Regarding the side effects of the prescribed medication (sleepiness), as discussed above, the record does not show support for any significant non-exertional limitation. Accordingly, the ALJ's did not err in his use of the grids.

### III. ORDER

For the foregoing reasons, the court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for summary judgment or remand.

DATED:    6/24/09

_____
RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff(s):**

Harvey P. Sackett						hps@hpspc.com


**Counsel for Defendant(s):**

Sara Winslow						sara.winslow@usdoj.gov
Joann M. Swanson					joann.swanson@usdoj.gov
Leo Rufino Montenegro				Leo.R.Montenegro@ssa.gov


Each party's counsel is responsible for ensuring that co-counsel receives a copy of this order if co-counsel has not registered for e-filing pursuant to the courts CM/ECF program.


**Dated: 6/24/09**				          **TER**
						          **Chambers of Judge Whyte**